Good morning, Your Honors. May it please the Court, I'm Roman Kesselman, the attorney for the petitioning party in this case. Sir, could you speak up just a little because it's a big courtroom and hard to hear and you can kind of pull that microphone toward you. Should I repeat everything from the beginning? We heard the good morning part. Good morning. We got the morning and we got your name, so. May it please the Court, I'd like to reserve two minutes for a rebuttal. All right. You can watch the clock there. If I may. And respectfully, I'm asking today for a day in court for a woman who has a rather unique procedural history with the immigration authorities in the United States. And I wanted to focus on two things, if I may, which is whether she, in fact, demonstrated changed country conditions, materially affecting her eligibility for asylum and withholding of removal, and whether she exercised due diligence in light of the false promises made by the government to her. So I'd like to start out that to see whether the country conditions have changed, we have to look at what was available before the court on the day when an absentia order of removal was signed back in 2010, versus what she presented was her motion to reopen. And what the judge had before him was her statement of persecution from 1997 or 1998, where she described instances of harm caused by private actors on a local level in her country. And then the judge also had a country conditions report, U.S. Department of State country conditions report from 2003, which in fact stated that the relationships between different religions in the country were amicable. That's Administrative Record 421. And this is a case that was originally presented on persecution for religious reasons for her Protestant evangelical faith. And the 2009 report that was also admitted into evidence, which essentially deals with the situation in the country for the year prior, which is 2008. That report simply stated that the government largely respected religious freedom. And while there was some discrimination against ethnic and religious minorities, the government largely respected religious freedom. Now, contrast that to what she has submitted in her motion to reopen. Well, first of all, she submitted evidence of significantly tightening law on religion that made it practically impossible for small Protestant groups in that country to exist because of the high number of registered members that they had to provide to the government in order to legitimate their existence. Otherwise, they cannot practice their religion at all. And then she submitted evidence of a violent government overthrow, a revolution that led to a wide-scale inter-ethnic violence throughout the country. Hundreds of thousands of people displaced, thousands of people dead, all kinds of ethnic minorities being attacked by the majority in the country. And that's not related to the religion. That's just inter-ethnic violence. And also evidence that new legislation that was promoting the native language and access to employment opportunities for native people limited the employment opportunities for everyone else, for the remaining minorities in the country. And then also that there was a rising violence against Christians in the context of that inter-ethnic violence. And I mean Protestant Christians, as well as the growth of Islamic religious extremism in the country. Those were the country conditions evidence she submitted with her motion to reopen. I want to talk about notice, but I don't want to foreshorten your argument on the religious persecution. But you want to also save three minutes for rebuttal. So with that, I'm sympathetic to the fact that she had this lawyer, and then when she had to go overseas, she didn't know she wouldn't be coming back. She didn't know what was going to occur there in terms of domestic abuse and other things. However, the BIA says, even given that, that you don't have equitable circumstances because she waited about four years to do anything in terms of the motion to reopen. So would you address how you would get around those findings by the BIA? Well, Your Honor, first of all, and we argued that with the board, she in fact relied on the false promise by the government, which was the fact of issuing a guest visa to her to come back to the United States. Very clearly, she wasn't supposed to be issued a visa. She was inadmissible for 10 years. There was a 10-year bar on entry for overstay and for the fact that she had an order of removal. And just like in her previous procedural history, that likely left her very confused. But she had a lawyer, although then he was permitted to withdraw, right? No, she withdrew back in 2010, her previous counsel. Okay. But the difficulty is she didn't do anything then for this long period of time. And during that time, how many times was she in and out of the United States? And I think to analyze this case to be— Well, let's just get that on the record first. How many times was she in and out of the United States after that? Three times. So apart from whatever guest visa she did or didn't have, she's back and forth in the United States three times. But she doesn't do anything about filing a motion to reopen, right? That is correct, simply because she didn't know what her status, what her situation was. She really didn't find out until 2014. The sympathetic side of my brain totally understands, but that places her in the situation of many immigration petitioners, and the law suggests that that is not an excuse. So is there some other legal principle we can look to that would help save her situation? Well, I think to understand her case, you have to talk about a cycle of abuse that she has experienced in that third country where she followed the father of her two U.S. citizen-born children, right? Because she has suffered from some severe domestic violence. But she is the mother of his two children, and he asked for her to come back and apologize. And I think she simply was uncertain whether she would be able to stay in Ukraine or would have to flee the country. And, yes, there is incidence of severe harm and then false promises of reconciliation and her trusting. She is, you know, a family-oriented person. She kept coming back. You may want to reserve the remaining time. Yes, she kept coming back to that situation until enough was enough, and that's when she finally came back to the United States and decided to see what she can do about her status. Thank you. Not realizing that there was an order of removal. And I'll reserve a minute and a half for a rebuttal, Your Honor. Good morning, Your Honor. This may please the Court. Andrew Nsinga on behalf of the Attorney General. The Board was not arbitrary nor capricious in denying this untimely motion to reopen. As Your Honor points out, all immigration petitioners before this Court essentially have a sympathetic situation. But that's not the end determination of the law. Over four years, between 2010 and 2014, she traveled multiple times between the United States. She obtained a Kyrgyzstani passport while in the Ukraine. She traveled while in the Ukraine. Petitioners' response largely is to assert that she was likely confused. But that's why we have administrative records with statements and evidence. At no point in her statement does she say she was confused. Well, Counsel, after she came back to the United States the last time, how long did it take for her to file? That was 13 months between September of 2013 and November of 2014. So even if we sort of toll periods here, we know there are, again, large swaths of time in which she did nothing. And what petitioner says is, well, she didn't know what was going on. And this is why Antonio Martinez's court said, well, when you participate in an earlier phase of proceedings, and you know there's a negative situation, you have a common-sense requirement to stay in contact with the court and your lawyer. And she had a lawyer. Part of what petitioner ignores is that in her own statement, she says, in fall of 2010, her undeniably abusive boyfriend returned her travel documents to her. Now, we don't know the exact date. In fall of 2010, he returned her travel documents. And then her hearing wasn't until December of 2010. But, again, no attempt to contact her attorney, no attempt to contact Immigration Corps as far as we know. So, again, large swaths of time in which she didn't do anything. So how can the board be arbitrary and capricious when we know there's large swaths of time in which she could have done something but didn't? Attorney changed country conditions. Ultimately, petitioner's evidence doesn't demonstrate a material change in her decision. Part of what petitioner ignores is an article she herself submitted. It was a June 2010 article. So this was about the time she actually left the United States, before her hearings were completed. At that point, that statement is on AR 216. Again, this was submitted with her motion reopened. It discusses ethnic and religious violence and discusses rape of Christian women. Petitioner's attempt to point to the situation as merely amicable is not accurate. In fact, part of what petitioner says about amicable relationships is with the Islamic community and Russian Orthodox community. She is not a Russian Orthodox. And part of her claim all the way back to 1998 dealt with accusations that Russian Orthodox, atheists, and Muslims would pursue dissenters in the country. This has been long an aspect of her claim. And there's no material change in Kyrgyzstan. Petitioner attempts to blame the United States, because undeniably CIS made an error in marking her passport as asylum-granted. All that occurred, though, pre-2010. So, yes, there was a problem. The government made a mistake. But that was the whole point of having the hearings in 2010. Her attorney knew there was an issue. This was the whole point of the upcoming hearings that she missed. Did we ever unravel how this happened? She applied. She had a hearing. No decision was issued. And then something got stamped. It really just seemed very peculiar to me. It is very peculiar. Part of the difficulty is the Department of Homeland Security was going to present the asylum officer to testify at the initial 2010 hearings. Unfortunately, because there was no hearing, there's just very little evidence. At best we know that at some point an AO, an asylum officer, stamped her 589 as referred, which would mean referred to the immigration judge and an NTA should issue. Somehow, instead, passports were stamped and 994 was sent. So, undeniably, again, a mistake. But that was the whole point of the 2010 hearings, to figure out what happened. So when she comes back to the United States, is it on the basis of that stamp that she gets permitted to enter the United States? No. So at that point, the asylum office, CIS, had asked her to return the I-94, the travel document which she had been traveling. And, in fact, she said, again in her statement, that in 2010 her travel documents, which appeared to be referring to her Kyrgyzstani passport, had expired. So, in fact, any new passport wouldn't have contained the I-94 documents. She claims that she entered on a nonimmigrant visa. We have no further evidence about that visa validity, anything about it. All we know is she claims that she received a visa. So we know nothing further beyond that. She didn't submit her new passport or the new visa or anything that she claimed that she had. So, unfortunately, there are a lot of unanswered questions. But as this Court has repeatedly recognized, it's Petitioner's burden to demonstrate diligence, lack of notice, and change country conditions. She did not meet that burden. The Board was not arbitrary nor capricious in its finding. And we ask that the Court deny the petition. Thank you. Thank you. You have some rebuttal time. Well, Your Honors, number one thing, amicable relationship between religions is reflected in the 2009 report, which was submitted by the government for that November 2010 hearing. And that was the only report available at that time. Everything that she submitted in her motion to reopen happened afterwards, or she would find out about it afterwards. She was not in her native Kyrgyzstan. She hasn't been there for a very, very long time. She traveled to her third country. She left the United States on a refugee travel document, not on any stamp or any obscure document or something unclear. Very clearly, government issued her a refugee travel document. And by the time it was returned to her, it was expired. So that was useless to even try to come back into the country. And, of course, she was in that relationship where she didn't know what was going to happen. And, again, we talked about the cycle of abuse. But I would just note that she left Ukraine and did not return in 2014 because, as many people know, Ukraine was plunged into enormous troubles in 2014 itself. And certainly it's understandable why she wouldn't want to bring her U.S. citizen children that year back to Ukraine because of all the violence and Russian invasion that took place in that country. That's not on the record, but it's pretty much common knowledge. And I think her case should be analyzed in the context of, you know, gross negligence by the government in keeping her in the United States for many years, issuing her visas as if no removal order was ever entered, and her situation as a whole with what happened in Ukraine and the uncertainty of what her options were at that point in time. And we respectfully ask the Court to look at the totality of the circumstances in this case and certainly on the changed country conditions, which to me is indisputable. Thank you. Thank you. I'd like to thank both counsel for your argument this morning. Butenko v. Whitaker is submitted. Our next case for argument is United States v. Doar.
judges: Thomas, McKeown, Christen